UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EMELINE D. WILSON | ) | Case No. 05-13928-SSM |
| | ) | Chapter 7 |
| Debtor | ) | |
| | ) | |
| EMELINE D. WILSON *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 06-1063 |
| | ) | |
| DAVID L. MOIR *et al.* | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OPINION**

When Emeline Wilson bought a parcel of real estate in August 2004, she signed three

deeds of trust to secure money that had been advanced in connection with the purchase. One

of those—in favor of David L. and Vanessa M. Moir—was recorded approximately an hour

before the deed by which she acquired title to the property. The other two—one in favor of

1st Mariner Bank and the other in favor of the seller, Charles Toone, Trustee—were

recorded with the deed. The present action seeks to avoid the Moir deed of trust under the

trustee's "strong-arm" powers, or, in the alternative, to equitably subordinate the Moirs'

claim, to recharacterize it as an equity investment instead of debt, to limit it to the funds

actually advanced, and to reduce it by the amount for which the Moirs have a third-party

guarantee. For their part, the holders of the competing deeds of trust seek to establish their

1

priority over the Moirs. Trial was held without a jury on August 28 and 29, 2006.  For the

reasons stated, the court determines that the Moir deed of trust is subordinate to the1st

Mariner and Toone deeds of trust, and that payment of a $250,000 "investment return" owed

to the Moirs should be equitably subordinated to the claims of unsecured creditors.  This

opinion constitutes the court's findings of fact and conclusions of law under Fed.R.Bankr.P.

7052 and Fed.R.Civ.P. 52(a).

Procedural Background and Findings of Fact

Emeline Wilson ("the debtor") filed a voluntary petition for reorganization under

chapter 11 of the Bankruptcy Code in this court on September 29, 2005, approximately one

year after the transaction at issue.  On August 15, 2006, her case was converted to chapter 7,

and Gordon P. Peyton has been appointed as trustee.

Among the assets listed on the debtor's schedules was a parcel of real estate located

at 6819 Old Georgetown Pike, McLean, Virginia, which she valued at $10,600,000.  She

purchased the property from Charles Toone, Trustee of the Toone Land Trust, for

$3,824,000 in August 2004, and her plan was to renovate the existing residence and to live

there if she could afford it, otherwise to sell the property for a profit.

The original contract to purchase the property was signed in February 2004, with

closing to occur within 90 days.  Ms. Wilson had difficulty obtaining the financing to

consummate the transaction, and several contract addenda were signed modifying the

purchase amount, amount to be taken back by the seller, deposit amount, and settlement

date.  The final contract terms called for a purchase price of $3,834,000, a cash deposit of

2

$50,000, a first-trust loan in the amount of $5,900,000, and seller take-back financing in the amount of $360,000.

In July 2004, Ms. Wilson had contacted Brett Amendola, then a junior loan officer at Fidelity and Trust Mortgage Company, about obtaining an acquisition and construction loan. Mr. Amendola submitted the debtor's loan application to his own company, which declined to make the loan. He then submitted the application to two other lenders, one of which rejected it. The second, 1st Mariner Bank, initially had reservations but ultimately agreed to make a one-year $5,900,000 acquisition and construction loan, with $3,800,000 to be disbursed at settlement and the remaining $2,100,000 to be available for construction. Among the loan conditions was a requirement that the debtor post certificates of deposit in the amount of $700,000 as additional collateral and place $100,000 in a money market account at 1st Mariner to pay interest.

The closing, which had been extended several times, took place on August 4, 2004, at the law firm of Melnick & Melnick. At that point, Ms. Wilson still had not been able to raise the final $800,000 required by 1st Mariner. The settlement agent nevertheless conducted a "dry settlement"—during which the deed, the 1st Mariner $5,900,000 note and deed of trust, and the Toone $360,000 note and deed of trust were signed—and had Ms. Wilson and Mr. Toone sign an Escrow Agreement in which they acknowledged that final settlement was subject to receipt of the $800,000 "collateral pledge."[1]

---

[1] The relevant figures from the settlement statement for Ms. Wilson's side of the transaction are as follows:

(continued...)

3

Ms. Wilson had a source for $300,000 of the needed funds, but was still short the

remaining $500,000. At that point, Mr. Amendola—whose firm was to receive a $118,000

commission if the 1st Mariner loan went to closing—contacted David L. Moir to inquire

whether he would be willing to loan $500,000 to Ms. Wilson to enable her to complete the

transaction.  He provided Mr. Moir with a document he had prepared entitled "Investment

Synopsis" which set forth the background and Ms. Wilson's need for the money to complete

the purchase.  The investment synopsis also mentioned that Ms. Wilson had a contract to sell

the home upon completion of construction to a company called Howell Holdings LLC for

$7.5 million.[2]  The document stressed the low level of risk in the following terms:

> The level of risk involved with this transaction is extremely minimal.  The
> funds for the investment will be held in a non-accessible certificate of deposit
> at 1st Mariner Bank. No individual can access the funds until an end loan is
> provided or she sells the property as per the ratified contract.  At the end of
> one-year [*sic*], when either Ms. Wilson provides new financing to satisfy her

---

[1](...continued)

| | | |
|---|---|---|
| Contract Sales Price | $3,824,000.00 | |
| Settlement charges to borrower | $401,092.25 | |
| Interim interest 8/4 to 9/1 Seller Fin. | $1,933.15 | |
| Construction Trust Escrow | $2,100,000.00 | |
| Collateral Pledge to Lender | $ 800,000.00 | |
| Purchaser interest reimbursement to Seller | $ 3,617.36 | |
|    Gross Amount Due from Borrower | | $7,130,642.76 |
| | | |
| Deposit or earnest money | $50,000.00 | |
| Principal amount of new loan(s) | $5,900,000.00 | |
| Seller Financing | $360,000.00 | |
| Adjustment for County Taxes 7/1 to 8/4 | $1,752.94 | |
|    Total Paid By/For Borrower | | $6,311,752.94 |
| | | |
| Cash From Borrower | | $ 818,889.82 |

[2]  According to Ms. Wilson's deposition testimony, the Howell Holdings contract was a
sham that had been put together by Brett Amendola to satisfy 1st Mariner and "did not really
exist."

4

debts with 1st Mariner or she sells the property, the funds will be distributed
back to the investor with a Fifty Percent (50%) profit on investment.

Mr. Moir ultimately agreed that he and his wife, Vanessa M. Moir, would provide

Ms. Wilson with "investment funds" in the amount of $500,000, to be held in trust by 1st

Mariner Bank in a certificate of deposit.  Upon sale or refinance of the property (which had

to occur within one year) Ms. Wilson would owe the Moirs the amount of their investment

plus an additional $250,000 (referred to as the "Investment return").  The return would be

reduced to $150,000 if the sale or refinance occurred within six months.  Pending the sale or

refinance, the Moirs would receive monthly "cost of carry" payments calculated at a rate of

6.5% per annum. The terms of the transaction are reflected in a document drafted by Mr.

Moir titled "Investment Agreement" signed August 10, 2004, by Ms. Wilson, the Moirs, and

the Amendolas.  Under the terms of the agreement, payment of $200,000 of the principal

would be guaranteed by Brett Amendola and his father, Roger Amendola, who were to

receive $85,000 from Ms. Wilson in exchange for their guarantees.  The agreement provided

that Ms. Wilson would "collateralize the investment" by "endorsing [the Moirs] as lien

holders" against the property.  Finally, the Moirs were also to receive a collateral assignment

of a $250,000 certificate of deposit in Ms. Wilson's name at Chevy Chase Bank that was due

to mature on September 26, 2004.  Mr. Moir prepared, and the debtor signed, a deed of trust

to secure what was described in the deed of trust as a "Deed of Trust Note of even date . . .

together with a Real Estate Return as more fully described in the Note."  There was no

promissory note as such, and Mr. Moir testified that the "note" referred to in the deed of

trust was the investment agreement.  After the deed of trust was signed, Mr. Moir gave it to a

settlement attorney he knew to be recorded but did not ask for a "rush" recording and did not give any instruction that it was to be recorded ahead of the other deeds of trust.

 1st Mariner and Mr. Toone had no knowledge of the Moir transaction, although Toone was aware that Ms. Wilson needed to raise an additional $800,000 in order to complete the closing.  The $500,000 from the Moirs was wire-transferred to Melnick & Melnick on August 10, 2004, in two separate transfers.[3]  On August 13, 2004, Melnick & Melnick received the remaining funds needed to complete the transaction in the form of two cashier's checks totaling $326,000 from Scott Milestone, who was a friend or business partner of Ms. Wilson.  Paul Melnick, the attorney who actually conducted the settlement, was never told that anyone other than 1st Mariner and Toone were getting deeds of trust against the property, and the settlement statement does not reflect any deeds of trust other than those.  Melnick & Melnick used the services of a company called Associated Abstract to record the deed to Ms. Wilson, the 1st Mariner deed of trust, and the Toone deed of trust—in that order—in the clerk's office of the Fairfax County Circuit Court.  The instruments were recorded at 1:41 p.m on August 13, 2004.  Unbeknown to Mr. Melnick, the Moir deed of trust had been recorded earlier that same day at 12:32 p.m.

 The grantor and grantee indexes in the clerk's office of the Fairfax County Circuit Court are maintained on a computer system.  Kenneth Paul Schrantz, an experienced title examiner who was familiar with the recording procedures in that office, testified for the Moirs that, although there is some work-load dependent delay between the time an

---

[3]  $255,000 came from an account of Mr. Moir, while $245,000 came from an account of Mrs. Moir.

instrument is presented for recordation and the time it appears in the computerized index, his

opinion was that the Moir deed of trust would have appeared if the grantor index been

searched in the name of Ms. Wilson an hour later.  It is undisputed, however, that title

examiners in Virginia do not customarily run the purchaser (as opposed to the seller) in the

grantor index prior to recording deeds and their associated purchase-money deeds of trust.

Even Mr. Schrantz does not do so as part his recording bring-down but only *after* the

instruments have been presented for recordation, his purpose being to verify that the

instruments had been properly indexed.

      The Moirs received payments from Ms. Wilson for six or seven months but then

received nothing further.  The $250,000 certificate of deposit at Chevy Chase Bank, as it

turned out, had already been pledged for another debt, and the Moirs received no payment

on account of it.  The Moirs have taken no action to enforce the guarantee of the Amendolas.

The 1st Mariner note eventually went into default and was purchased by an entity called TS3

Grantor Trust, of which Mr. Toone is trustee.  Although the record is not entirely clear on

the point, it was apparently in this time frame that 1st Mariner and Mr. Toone first learned

that the Moir deed of trust had been recorded ahead of theirs.  At the time she filed her

chapter 11 petition, Ms. Wilson expected that she would be able to sell the property for an

amount sufficient to pay all three deeds of trust.  At some point, however, it became

apparent that the property would not sell for anywhere near the $10,600,000 market value

shown on the schedules.[4]

--------

[4]  Subsequent to the commencement of this action, the debtor entered into a contract to sell
the property for $4,560,000 free and clear of liens.  An order approving the sale was entered

(continued...)

The present action was commenced by Ms. Wilson on March 1, 2006, against the Moirs, the Amendolas, and the two trustees, Jeffrey J. Fairfield (incorrectly sued as "Jeffrey J. Fairchild") and Norman F. Hammer, named in the Moir deed of trust. TS3 Grantor Trust and Mr. Toone were named as nominal defendants, but no relief was sought against them. The complaint was subsequently amended to add the trustees of their respective deeds of trust as nominal defendants also. The Moirs for their part, and TS3 and Toone for theirs, have each filed cross-complaints against the other to establish the priority of their respective deed of trust.

The amended complaint is pleaded in four counts. Count I seeks to set aside the Moir deed of trust under Ms. Wilson's "strong-arm" powers as a debtor in possession. Count II seeks equitable subordination of the deed of trust or recharacterization of it as equity. Count III seeks to limit the amount of the lien to the $500,000 actually advanced by the Moirs, further reduced by the $200,000 Amendola guarantee. And Count IV seeks disallowance of the Moir claim as a secured claim and reduction of the "gross amount" of the claim consistent with the relief granted on the other counts.

The TS3 and Toone cross-claim against the Moirs is pleaded in three counts. Count I seeks a declaration that the Moir deed of trust is void as to TS3 and Toone. Count II seeks a

---

[4](...continued)

on May 3, 2006. The court is not advised as to the current status of the contract, which apparently has never gone to settlement. TS3, as holder of the 1st Mariner note, has filed a proof of claim in the amount of $4,206,583. Mr. Toone, as Trustee of the Toone Land Trust, has filed a proof of claim in the amount of $378,350. The Moirs have filed a proof of claim in the amount of $750,000. And finally, the County of Fairfax has filed a proof of claim in the amount of $31,261 for past-due real estate taxes. The filed secured claims against the property thus exceed the sales price by more than $803,000.

declaration that the TS3 and Toone deeds of trust are purchase-money deeds of trust with priority over the Moir deed of trust.  Count III seeks a declaration that TS3 and Toone are equitably subrogated to the existing $1.189 million deed of trust that was paid off when Ms. Wilson acquired the property.  Finally, Count IV seeks equitable subordination of the Moir deed of trust.

The Moir cross-claim against TS3 and Toone is pleaded in two counts.  Count I seeks a determination that the Moir deed of trust has priority over the TS3 and Toone deeds of trust. Count II asserts that TS3 and Toone have additional collateral and should be required, under principles of marshaling, to first seek payment from those sources.[5]

After the parties were at issue, Ms. Wilson brought an unsuccessful motion for summary judgment on the "strong-arm" avoidance claim.  *Wilson v. Moir (In re Wilson)*, No. 05-13928, AP No. 06-1063, 2006 Bankr. LEXIS 1001 (Bankr. E.D. Va., May 26, 2006). The denial of summary judgment was predicated primarily on the decision of the Fourth Circuit in *Pyne v. Hartman Paving, Inc. (In re Hartman Paving, Inc.)*, 745 F.2d 307 (4th Cir. 1984), which held that a debtor's actual knowledge of a defectively-recorded deed of trust would prevent her from using her debtor in possession strong-arm powers to avoid it. Following the denial of summary judgment, the debtor's case was converted from chapter 11 to chapter 7, and on the opening day of trial the chapter 7 trustee, Gordon P. Peyton, was substituted as plaintiff on Count I of the complaint and was joined as an additional plaintiff on Counts II, III, and IV.

---

[5]  No evidence or argument was presented at trial on Count II of the Moir cross-claim, and the court therefore treats it as having been abandoned.

Conclusions of Law and Discussion

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. A determination of the validity, extent or priority of liens is a core proceeding in which a final judgment may be entered by a bankruptcy judge. 28 U.S.C. § 157(b)(2)(K). Venue is proper in this district under 28 U.S.C. § 1409(a). The defendants have been properly served and, with the exception of the trustees under the TS3 and Toone deeds of trust, have appeared generally.

II.

Although the trustee, TS3, and Toone are united in challenging the Moir deed of trust, their interests diverge significantly because the trustee seeks under § 551, Bankruptcy Code, to preserve the putative first-lien position for the benefit of the estate, which would leave TS3 and Toone subordinate to the position the Moirs previously occupied. TS3 and Toone assert that because outside bankruptcy their deeds of trust would be superior to the Moir deed of trust, any lien preserved as a result of avoiding the Moir deed of trust would nevertheless be subordinate to their lien position. Because the court agrees that the relative position of the TS3, Toone and Moir deeds of trust outside of bankruptcy must be resolved prior to consideration of the trustee's avoidance claim, the court will address that issue first.

A.

TS3 and Toone argue that their deeds of trust are not subject to the Moir deed of trust because it was not in the chain of title at the time their own deeds of trust were recorded. In

10

this connection, they rely primarily on Section 55-105, Code of Virginia (1950), which

states:

> A purchaser shall not, under this chapter, be affected by the record of a deed
> or contract made by a person under whom his title is not derived; nor by the
> record of a deed or contract made by any person under whom the title of such
> purchaser is derived, if it was made by such person *before he acquired the legal
> title of record*.

(emphasis added).  Since Ms. Wilson did not acquire "legal title of record" until the deed

from Mr. Toone to her was recorded at 1:41 p.m., they reason, they cannot be bound by a

deed of trust from her recorded at an earlier time, even that same day.  The Moirs, for their

part, assert that a purchaser with actual knowledge of a prior conveyance is not protected by

§ 55-105; that Brett Amendola's knowledge is imputable at least to 1st Mariner; and that

both 1st Mariner and Toone were on inquiry notice of a possible competing deed of trust.

### B.

The initial question to be resolved is whether § 55-105 allows a party who has actual

or inquiry knowledge of an conveyance that occurred prior to the date his grantor acquired

legal title to simply ignore the conveyance when accepting a deed or deed of trust from the

grantor.  Put another way, is § 55-105 merely a restriction on the constructive notice that

would otherwise arise from recordation of the earlier conveyance, or does it actually void

the conveyance as to purchasers and mortgagees who dealt with the owner after he or she

acquired record title?  This issue was discussed at length in the court's prior memorandum

opinion, although in the significantly different context of whether a hypothetical bona fide

purchaser from Ms. Wilson on the filing date of the bankruptcy petition (approximately a

11

year after the events in question) would have acquired title free from the lien of the Moir

deed of trust.

　　As noted in the prior opinion, in Virginia the mere fact that a deed of trust is recorded

before the mortgagor acquires title to the property does not affect its validity as between the

parties:

> When a deed purports to convey property, real or personal, describing it with
> reasonable certainty, which the grantor does not own at the time of the
> execution of the deed, but subsequently acquires, such deed shall, *as between
> the parties thereto*, have the same effect as if the title which the grantor
> subsequently acquires were vested in him at the time of the execution of such
> deed and thereby conveyed.

Va. Code Ann. § 55-52 (emphasis added).  Here, however, we are not dealing solely with the

rights of the Moirs vis-a-vis Ms. Wilson, but rather with the rights of third parties, namely

1st Mariner and Toone.  Consequently, § 55-22 does not insulate the Moir deed of trust from

an attack predicated on § 55-105.  As the court explained in the prior opinion, however,

there is an additional factor at play.  In Virginia, a bona fide purchaser for value is required

to examine the land records and is chargeable with such knowledge as might be revealed by

such examination.  *Chavez v. Gibbs*, 198 Va. 379, 382, 94 S.E.2d 195, 197 (1956); *see also*,

*National Mut. Bldg.  Loan Assn. v. Blair*, 98 Va. 490, 498, 36 S.E. 513, 515 (1900) ("Under

the [recording] statute, only purchasers without notice can take advantage of a failure to

record.").

　　Even though an argument could be made that the plain language of § 55-105

empowers a purchaser to ignore any deed of trust that was recorded "before [the seller]

acquired the legal title of record," the only reported Virginia case construing the statute is far

from clear as to whether it should be read that broadly.  *Porter v. Wilson*, 244 Va. 366, 421

12

S.E.2d 440 (1992).  In that case, an owner who had bought 53 acres of land but had never received a deed sold a 26-acre portion to a purchaser.  The deed to the 26 acres was recorded.  After the seller's death, his children sold the entire 53 acres to a different purchaser.  *Id.* at 368, 421 S.E.2d at 441. When the second purchaser began to cut timber on the first purchaser's 26 acres, the first purchaser sued for trespass.  The second purchaser attempted to defend his claim to the entire 55 acres by relying on § 55-105 and arguing that he could not be affected by the prior deed for the 26 acres because it was recorded at a time when the original owner did not have record title.  *Id.* at 368-70, 421 S.E.2d at 441-42.  The Supreme Court of Virginia, however, held that because the original owner *never* had "record" title (even though he had good title by adverse possession), § 55-105 simply did not apply.  *Id.* at 370, 421 S.E.2d at 442.

In the course of the *Porter* opinion, the Court briefly discussed the history of the statute.  The Court explained that the revisors of the Virginia Codes of 1849 and 1919 intended the statutory precursor of § 55-105 "to reflect the principle" articulated by one of the three judges of the then-Court of Appeals of Virginia in *Doswell v. Buchanan's Ex'rs*, 30 Va. (3 Leigh) 365 (1831).  *Porter*, 244 Va. at 370, 421 S.E.2d at 442.  That principle, as stated in the revisors' notes, was as follows:

> [I]f after a person purchased land or acquired an EQUITABLE INTEREST in it, BUT BEFORE HE ACQUIRED THE LEGAL TITLE, conveyed it, . . . and AFTERWARDS acquired the legal title, and sold the land, the purchaser would not have to go back of the date when the LEGAL title was acquired and would be unaffected by the sale . . . made while he held only any equitable title . . . *if he had no knowledge of it*.  The purchaser would get a good title if the chain was complete and disclosed no defects after the party acquired the legal title.

13

*Id.* at 370, 421 S.E.2d at 442 (*quoting* Revisors' Note, Code § 5201 (1919)) (capitalization in original) (emphasis added).

Just how § 55-105 actually "reflects the principle" set forth in *Doswell* is not entirely clear.  The underlying facts in *Doswell* are complicated, but, at the risk of oversimplification, may be summarized as follows.  Sometime prior to 1808, John Lyons sold a 1500-acre tract of land called "Bullfield" to John Hopkins but did not give Hopkins a deed.  Indeed, at the time of the sale, Lyons himself did not have a deed to the property. *Doswell*.  In 1808 Hopkins, the purchaser, gave John Buchanan a deed of trust on 800 acres of Bullfield to secure repayment of a loan.  That deed of trust was recorded at the time the loan was made.  Lyons did not get a deed to Bullfield until 1811, and he did not execute a deed to Hopkins until 1814.  In the interim, Hopkins sold the land to James Doswell in 1811.  Buchanan then brought a chancery suit to subject the 800 acres to the payment of his debt, and Doswell defended on the basis that he was a good faith purchaser who had no actual notice of Buchanan's deed of trust.

The legal point of dispute on appeal was whether, under the recording statutes then in effect, a recorded deed of trust constituted constructive notice.  The lead opinion by Judge Carr, while holding that recordation did not constitute constructive notice, went on to argue that even if it did, it should not extend to Buchanan's deed of trust:

> But, even if it were admitted to have been the duty of Doswell to search the records, how far ought that search to be carried?  *Assuredly, not beyond the period at which the legal title vested in the vendor.*  Suppose him to take the advice of counsel: he would call for the chain of title; . . . and seeing that the title . . . was by deed [of December 1810] conveyed to Hopkins, he would look *from this date down* to the time of consultation, to see whether there were any incumbrances.  This is all that could, with any shew of reason, be required

> of him: but this would never lead him to the deed of trust of May 1808, made
> by Hopkins to Buchanan[.]

*Id.* at 381 (emphasis added).  It is evidently this passage that is the source of the principle

reflected in § 55-105.  In his dissenting opinion, Judge Cabell argued unsuccessfully that

Dowell should be treated as having constructive notice of the Buchanan deed of trust:

> "Every man of ordinary prudence," about to purchase from another, searches
> the record, to see whether the property has been previously conveyed or
> incumbered.  It is gross negligence not to do so.  He who fails to do it, wilfully
> shuts his eyes against the truth, and ought not to be permitted to avail himself
> of his ignorance.  So far from having equal equity, with a former *bona fide*
> incumbrancer, whose deed is duly recorded, he has no equity at all.

*Doswell*, 30 Va. (3 Leigh) at 385.  Judge Cabell's disagreement with the majority, however,

related solely to the issue of *constructive* notice, which he defined as "no more than evidence

of notice, the presumptions of which are so violent, that the court will not even allow of its

being controverted."  *Id*.  As to the effect of *actual* notice, he agreed with the majority: "It is

admitted, on all hands, that *actual notice of a prior deed of trust or mortgage, will bind a*

*subsequent purchaser*[.]"  *Id.* at 384 (emphasis added).  And he further conceded that if the

recorded deed of trust were not construed as providing constructive notice, the correct rule

of law was that the purchaser "ought to be protected" with respect to a purchase, or any

portion of it, made "*before he received actual notice* of the existence" of the earlier

conveyance.  *Id.* at 388 (emphasis added).

Given the analysis in *Doswell* and the teaching in *Porter* that § 55-105 was intended

to codify the principles of that case, the court must conclude that § 55-105 is simply a

limitation on the constructive notice that would otherwise arise from recordation and does

not allow a purchaser or mortgagee to simply ignore a conveyance or mortgage recorded

15

prior to the time the grantor acquired record title where the purchaser has actual knowledge
or inquiry knowledge of its existence.

C.

That said, the question remains whether the evidence shows any such knowledge.
The court finds that it does not.  The evidence is clear that neither 1st Mariner nor Toone
had actual knowledge of the existence of the Moir deed of trust or the fact that it had been
recorded prior to theirs.  It is true that the loan broker, Brett Amendola (since he signed the
investment agreement as a guarantor) must have known that the investment was to be
secured by a deed of trust against the parcel.  But even if a loan broker were deemed to be an
agent of the lender such that the broker's knowledge were attributable to the lender,[6] the
evidence does not show that Mr. Amendola knew or expected that the Moir deed of trust
was going to be placed on record *prior* to the 1st Mariner or Toone deed of trust.  The
investment agreement nowhere specifies that the Moirs were to be placed in a first-lien
position against the property, and as a professional loan broker Mr. Amendola would surely
not have expected 1st Mariner to accept anything other than a first-lien position on an
acquisition and construction loan.  Indeed, the very fact that the investment agreement
provides so many other protections for the Moirs—specifically, the personal guarantee by
the Amendolas and the pledge of the certificate of deposit—is compelling evidence that
Brett Amendola and the Moirs fully expected that the Moir deed of trust would be
subordinate to the 1st Mariner deed of trust, since there would palpably have been no need

---

[6] In his live testimony, Mr. Amendola described himself as the "contact point" for 1st
Mariner, but in his deposition stated that he considered himself as working for Ms. Wilson.

for such protections if the Moirs were to have a first-lien position for $750,000 on a property worth more than $5 million.

The court additionally cannot find that either 1st Mariner or Toone were placed on inquiry notice of a possible deed of trust ahead of theirs simply because they knew Ms. Wilson was still short of the funds needed to complete closing.  Even if they might have suspected that Ms. Wilson would be borrowing the funds from a third party, there was no particular reason for them to anticipate that whoever supplied the funds would be seeking to record a deed of trust, let alone a deed of trust having priority over their own.

Finally, the court cannot find that a title bring-down performed according to customary standards in Virginia would have provided actual notice to 1st Mariner or Toone of the Moir deed of trust.  The most that the testimony of the Moirs' expert established was that *if* a title examiner had searched the grantor index in the clerk's office of the Fairfax County Circuit Court at or about 1:41 p.m. on August 13, 2004, for transactions by Emeline Wilson, the Moir deed of trust would likely have appeared.  Even he agreed, however, that it was not customary to run the *buyer* of real property in the grantor index as part of a recording bring-down; indeed, he did not do so himself prior to presenting deeds for recordation.  His personal practice, rather, was to search the buyer's name in the grantor index—*after* the instruments had already been recorded—to insure that they had been properly indexed.

There are good reasons why a title examiner would not search the grantor index in the buyer's name as part of a title search for a transaction in which the buyer would be executing deeds of trust to secure the purchase price.  As discussed earlier in this opinion,

under § 55-105, Code of Virginia, the recording of a deed or contract before a party acquires

legal title of record does not constitute constructive notice to subsequent purchasers or

mortgagors.  Additionally, in Virginia, the doctrine of "transitory seisin" would prevent any

interest that is perfected simultaneously with the acquisition of title from achieving priority

over a deed of trust to secure the purchase price of the property.  As explained in an early

decision,

> When, therefore, land is conveyed and the purchaser at the same time gives
> back a mortgage or other incumbrance to secure the purchase-money, he does
> not thereby acquire any such *seisin* or interest as will entitle his wife to dower,
> or his creditor to subject the land to his debts discharged of the mortgage.  In
> such cases the deed and mortgage are regarded as parts of the same contract,
> and constitute but a single transaction, investing the purchaser with *seisin* for a
> transitory instant only.

*Summers v. Darne*, 72 Va. (31 Gratt.) 576 (1879).  *See also Straus v. Bodeker's Ex'x*, 86 Va.

543, 10 S.E. 570 (1889) (judgment against buyer did not have priority over deed of trust for

purchase price); *Hurst v. Dulaney*, 87 Va. 444, 12 S.E. 800 (1891) (wife's dower interest did

not have priority over deed of trust for purchase price); *Charlottesville Hardware Co. v.

Perkins*, 118 Va. 34, 85 S.E. 869 (1915) (judgment lien was subordinate to deed of trust

securing the purchase price even though the deed of trust was not recorded until almost a

year after the sale, where recitals in the deed stated that a deed of trust had been executed).

In short, the court cannot find that the mere recording of the Moir deed of trust prior

to the time she acquired legal title of record would have provided either constructive or

inquiry notice to 1st Mariner and Toone of the existence of a competing deed of trust.  For

that reason, the court agrees with TS3 and Toone that the priority of their respective deeds of

trust are unaffected by, and are superior to, the Moir deed of trust, and the court will enter

judgment in their favor to that effect.

D.

Because the court agrees that the purchase-money liens of TS3 and Toone are not

affected by the recording of the Moir deed of trust prior to the time the deed to Ms. Wilson

was placed on record, the court need not reach their alternate argument that because both the

deed and the 1st Mariner and Toone deeds of trust were *executed* prior to the execution of

the Moir deed of trust, and because the Moirs either knew or were charged with knowledge

of the sales contract under which 1st Mariner and Toone would be secured by deeds of trust,

the Moirs are not good faith purchasers, and their lien is subordinate to that of TS3 and

Toone under the maxim "that he who is prior in time is prior in law — that where two

equities are equal, the prior equity shall prevail."  *Wasserman v. Metzger*, 105 Va. 744, 749,

54 S.E. 893, 894 (1906).  Additionally, since the ruling determining that the Moir deed of

trust is subordinate to the TS3 and Toone deeds of trust provides full relief to TS3 and

Toone, the court need not rule on their equitable subrogation and equitable subordination

claims.

III.

Given the court's ruling as to the relative priority of the TS3, Toone, and Moir deeds

of trust, the trustee's avoidance claim has effectively been rendered moot.  Although the

debtor's schedules valued the property at $10,600,000, the contract of sale ultimately

approved by the court was for only $4,560,000.  The proofs of claim filed by Fairfax

County, TS3 and Toone total more than this amount, leaving the Moir claim unsecured

19

unless there is either a successful challenge to the TS3 or Toone proofs of claim or the
currently approved purchaser defaults and the trustee is able to sell the property for
significantly more.  Because neither outcome can be entirely ruled out, however, some
discussion of the avoidance issue is appropriate.

      As discussed in the prior memorandum opinion, a bankruptcy trustee has "the rights
and powers of, or may avoid any transfer of property of the debtor . . . that is voidable by . . .
a bona fide purchaser of real property, other than fixtures, from the debtor . . . that obtains
the status of a bona fide purchaser at the time of the commencement of the case[.]"
 § 544(a)(3), Bankruptcy Code.  "Simply stated, the bankruptcy trustee is in the same
position, with respect to real estate, as if he were a bona fide purchaser who bought the
property from the debtor on the filing date and simultaneously perfected the transfer by
recording a deed."  *Mayer v. United States (In re Reasonover),* 236 B.R. 219, 227 (Bankr.
E.D. Va. 1999), *remanded for further proceedings* 238 F.3d 414 (4th Cir. 2000) (unpublished
table decision).  *See Owen-Ames-Kimball Co. v. Michigan Lithographing Co.* (*In re Michigan
Lithographing Co.*), 997 F.2d 1158, 1159 (6th Cir. 1993) ("[A] trustee in bankruptcy is given
the rights and powers of a bona fide purchaser of real property from the debtor if, at the time
the bankruptcy is commenced, a hypothetical buyer could have obtained bona fide purchaser
status.").  The question, therefore, is whether a bona fide purchaser who had bought the
property from Ms. Wilson on September 29, 2005—the date of the bankruptcy filing—and
had recorded his deed the same date, would have taken the property free from the Moir deed
of trust.

When this issue was previously presented to the court, a trustee had not been appointed, and Ms. Wilson was prosecuting the avoidance claim in her capacity as debtor in possession. Because a controlling Fourth Circuit opinion, *Pyne v. Hartman Paving, Inc. (In re Hartman Paving, Inc.),* 745 F.2d 307 (4th Cir. 1984), apparently barred a chapter 11 debtor in possession with actual knowledge of a defective deed of trust from using the trustee's strong-arm powers to avoid it,[7] the court was not required to reach the more difficult question of whether a bona fide purchaser for value would have been bound by the Moir deed of trust. The court nevertheless did briefly discuss the issue. Much of that analysis has already been set forth in this opinion in determining the priority of the TS3 and Toone deeds of trust and need not be repeated.

Because the Moir deed of trust was recorded prior to the time the deed to Ms. Wilson was placed on record, a bona fide purchaser from her on September 25, 2005, would not be charged with *constructive* notice of its existence. Va. Code Ann. § 55-105. As the court has already concluded, however, a purchaser may not simply ignore a deed of trust of which he or she has actual or inquiry notice. A crucial and fundamental difference between TS3 and

---

[7] As this court observed in the prior opinion, the extent to which *Hartman Paving*—which the Fourth Circuit itself has not cited in the more than 20 years since it was decided—remains good law is questionable. Every other circuit that has addressed the issue has reached a contrary conclusion. *In re Probasco*, 839 F.2d 1352, 1354 (9th Cir. 1988); *In re Sandy Ridge Oil Co.*, 807 F.2d 1332, 1336 (7th Cir. 1986); *McCannon v. Marston*, 679 F.2d 13, 16–17 (3rd Cir. 1982). The decision has also been criticized by two lower courts within this circuit, one of which was able to avoid its holding by distinguishing it on the facts, *In re MSC, Inc.*, 54 B.R. 650, 652 (Bankr. D. S.C. 1985), and the other by simply assuming it was no longer good law. *Glanz v. RJF Int'l Corp. (In re Glanz)*, 205 B.R. 750, 754–55 (Bankr. D. Md. 1997). This court noted, however, that there did not appear to be any principled way of distinguishing the present case from *Hartman Paving* and concluded that, in the absence of an intervening statutory change or Supreme Court ruling, the opinion remained controlling on lower courts within the Fourth Circuit.

Toone on the one hand, and a purchaser from Ms. Wilson one year later on the other, is that

such a purchaser *would* have to search the grantor index under Ms. Wilson's name for

adverse conveyances in order to qualify as a bona fide purchaser.  The testimony was

undisputed that, while a search of the grantor index in the clerk's office of the Fairfax

County Circuit Court could be limited to specific dates, it could not be limited to specific

times of day.  Thus, a search on September 25, 2005, of the grantor index under the name of

Emeline Wilson—even a search that was limited to transactions on or after August 13, 2004

(the date the deed to her was recorded)—would have shown the Moir deed of trust.  At the

very least, therefore, a hypothetical purchaser from the debtor would have had inquiry notice

of the Moir deed of trust and could not ignore it and still claim to be a bona fide purchaser.

Thus, the court concludes that the trustee is not able, under his strong-arm powers as a

hypothetical bona fide purchaser of real estate, to avoid the Moir deed of trust.  Accordingly,

judgment will be entered for the Moirs dismissing Count I of the complaint.

## IV.

There remain for consideration the trustee's and debtor's claims for equitable

subordination or recharacterization of the Moir claim and for disallowance of that portion of

the claim that comprises the $250,000 "investment return" and the $200,000 principal for

which the Amendolas are liable under their guarantee.

## A.

In Count II, the trustee and the debtor seek to have the Moir claim equitably

subordinated not only to the TS3 and Toone deed of trust, but also to the claims of general

unsecured creditors. In this connection, a bankruptcy court may

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

§ 510(c), Bankruptcy Code.  The Supreme Court has explained that, although Congress "included no explicit criteria for equitable subordination" when it enacted § 510(c), the language of the statute "clearly indicates congressional intent at least to start with existing doctrine." *United States v. Noland*, 517 U.S. 535, 539, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996).  That existing doctrine, as the Court observed, was judge-made and was generally triggered by a showing that the creditor had engaged in "some type of inequitable conduct" that "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Id.* at 538, 116 S.Ct. at 1526.  The Fourth Circuit has adopted the test set forth in an often-cited opinion by the Fifth Circuit, *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692 (5th Cir. 1977).  *See EEE Comm'l Corp. v. Holmes (In re ASI Reactivation, Inc.)*, 934 F.2d 1315 (4th Cir. 1991).  Under that test, equitable subordination generally requires an inquiry into (1) whether the claimant engaged in fraudulent conduct, (2) whether the conduct resulted in injury to creditors, and (3) whether subordination would be consistent with the bankruptcy law.  *Mobile Steel*, 563 F.2d at 699-700; *ASI Reactivation*, 934 F.2d at 1320-21.  *See also Pepper v. Litton*, 305 U.S. 295, 300-10, 60 S.Ct. 238, 246-47, 84 L.Ed. 281(1939) (stating that a bankruptcy court, as a court of equity, may sift the circumstances surrounding a claim to prevent injustice and may subordinate claims of controlling stockholders to prevent injustice). As the Tenth Circuit recently explained,

23

"Inequitable conduct" for subordination purposes encompasses three categories of
misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2)
undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality
or alter ego.

*In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1301 (10th Cir. 2004).  It has been said that

"equitable subordination is an extraordinary remedy which is applied sparingly."  *Bank of N.Y. v.*

*Epic Resorts–Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 307 B.R. 767, 773

(D. Del. 2004).  For this reason, where the claimant is *not* an insider or a fiduciary, the party

seeking equitable subordination must "demonstrate ... egregious conduct such as gross

misconduct tantamount to fraud, misrepresentation, overreaching, or spoliation."  *Hedged-Invs.*,

380 F.3d at 1301-02; *accord, Epic Capital Corp.*, 307 B.R. at 772.

The trustee's and the debtor's argument, stripped to its essentials, is that because the

Moirs advanced funds as an investment rather than a loan, their claim should not have

priority over, or even share ratably with, the claims of creditors who loaned money or

extended credit to the debtor.  It is, of course, true that the agreement—which was prepared

by Mr. Moir—setting out the terms of the transaction consistently refers to the funds being

provided as an "investment" rather than a loan.  Yet, it also refers to Ms. Wilson throughout

as the "borrower" and also refers at one point to the "debt secured by this agreement."

Additionally, there is no evidence that the Moirs engaged in fraud or some other conduct

designed to secure an unfair advantage over other creditors.  Nor were the Moirs insiders

taking advantage of some special relationship to, or influence over, the debtor.  Rather it

appears that they acted in good faith to provide Ms. Wilson the funds she needed in order to

complete the purchase of the property.  At the time the terms were agreed to, bankruptcy

was not even on the horizon, and everyone fully expected that Ms. Wilson would be able to

24

refinance or sell the property within a year and pay everyone off.  At least, then, as to the

principal and interest ("cost of carry") on the funds advanced by the Moirs, no basis has

been shown to equitably subordinate their claim to the claims of other creditors.

      The $250,000 "kicker" presents a more difficult issue, since it seems likely that one

of the reasons—perhaps even the primary reason— the agreement refers to the transaction as

an investment rather than a loan is to avoid the maximum limits on interest under Virginia

usury laws.  Except as otherwise permitted, the maximum rate of interest that may be

charged on a loan in Virginia is 12% per annum.  Va. Code Ann. § 6.1-330.55.  The

exceptions, to be sure, are so legion as to almost swallow the rule.  In particular, there is no

interest limit on loans secured by a first deed of trust against real estate.  Va. Code Ann. §

6.1-330.69.  But while the investment agreement in this case provides that the sums due

from Ms. Wilson would be secured by a deed of trust against the property she was acquiring,

nothing in the agreement specifically requires or contemplates that the deed of trust would

be a first deed of trust.  Indeed, the priority of the deed of trust was never a subject of the

negotiations between the Moirs and Ms. Wilson.  For loans secured by a subordinate

mortgage or deed of trust on residential real estate improved by one to four family dwelling

units, the general limit on interest (subject to many exceptions, none of which apply here) is

an annual yield of 18%.  Va. Code Ann. § 6.1-330.71.  Thus, by characterizing the advance

of funds as an "investment" rather than a loan, the Moirs have positioned themselves to

receive a return that far exceeds what they would have been entitled to had the transaction

been denominated a loan.

It is true that there is nothing inherently inequitable when parties dealing at arm's length with each other agree to structure a financial transaction in a way that is more favorable to the party putting up the money.  Put another way, equitable subordination is not appropriate simply because the claim is larger than it would have been had the parties structured the transaction some other way.  Nevertheless, even though the agreement to pay $250,000 as an "investment return" may not rise to the traditional level of "egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching, or spoliation," *Hedged-Invs.*, 380 F.3d at 1301-02,  the court is persuaded that a claim for what amounts to dashed expectations of a large profit rather than out-of-pocket losses unfairly dilutes the claims of creditors who will likely not recover even their principal.  For that reason, the court concludes that under the specific facts of this case, the $250,000 "investment return" should be subordinated to the claims of general creditors. Accordingly, judgment will be entered for the trustee and the debtor on Count II subordinating payment of the $250,000 "investment return" to claims of timely-filed unsecured creditors.

### B.

As an alternative to equitable subordination, the debtor and the trustee ask that the court recharacterize the Moir claim as an equity investment.  As a practical matter, recharacterization of a debt as equity achieves essentially the same result as equitable subordination, since equity receives distributions in bankruptcy only after creditors have been paid in full.  *Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 322 (D. Del. 2003).  However, recharacterization proceeds from a different premise.  Equitable subordination, as noted, focuses on the creditor's conduct vis-a-vis the debtor or other creditors.

By contrast, "[w]hen a putative loan to a corporation is recharacterized, the courts effectively

ignore the label attached to the transaction at issue *and instead recognize its true substance*." *In

re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1297 (10th Cir. 2004) (emphasis added).  As a

result, "[t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy

proceedings as corporate debt, but are instead treated as a capital contribution."  *Id.*

Courts have articulated a number of tests for determining whether to recharacterize debt

as equity.  In a recent decision, the Fourth Circuit endorsed a test that considered the following

factors:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2)
> the presence or absence of a fixed maturity date and schedule of payments; (3) the
> presence or absence of a fixed rate of interest and interest payments; (4) the
> source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the
> identity of interest between the creditor and the stockholder; (7) the security, if
> any, for the advances; (8) the corporation's ability to obtain financing from
> outside lending institutions; (9) the extent to which the advances were
> subordinated to the claims of outside creditors; (10) the extent to which the
> advances were used to acquire capital assets; and (11) the presence or absence of
> a sinking fund to provide repayments.

*Official Committee of Unsecured Creditors v. Fairchild Dornier GmbH (In re Dornier Aviation

(North America), Inc.)*, 453 F.3d 225, 233 (4th Cir. 2006) (citing *Bayer Corp. v. Masco Tech,

Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001)).

As a threshold issue, however, the court must consider whether a claim against an

individual debtor, as opposed to a corporation, can ever be recharacterized as "equity."

Individuals, unlike corporations, do not have shareholders or other forms of equity interests.  The

debtor and the trustee have cited no cases in which a bankruptcy court has recharacterized a debt

as equity when the debtor was an individual.  At the same time, where an individual enters

upon a business venture, a "silent partner" providing funds to what is effectively, even if not

27

formally, a joint venture could be seen as making an equity investment rather than a loan.

The court will assume, therefore, that in appropriate circumstances the advance of funds to

an individual might be viewed as an equity investment rather than a loan.  In the present

case, however, the court is unable to find that the requirements for treating the $500,000

advance as an equity investment have been met.  Although it is true that the agreement

consistently refers to the advance as an "investment," there is a fixed maturity date, a fixed

schedule of payments; and a fixed interest rate ("cost of carry").  The Moirs are given no control

over the project, and neither the amount or timing of repayment is contingent upon the financial

success of the project.  Accordingly, even assuming that recharacterization could properly be

applied in the case of an individual debtor, the facts of this case do not support such a

remedy.

C.

Only brief discussion is warranted with respect Count III, which seeks to disallow as

components of the Moirs' claim both the $250,000 investment return and the $200,000

portion of the principal that is guaranteed by the Amendolas.  While good arguments have

been put forth for equitably subordinating the investment return, no authority has been cited

to show that it is not otherwise an enforceable obligation and should therefore be disallowed.

Similarly, no authority has been cited to support disallowance of an otherwise valid claim

simply because it has been guaranteed by someone else.  It was the debtor who received the

$500,000 that the Moirs advanced and it is the debtor who is primarily liable for its

repayment.  The court is aware of no authority—and certainly, none has been cited—for the

proposition that a creditor must proceed against a guarantor before seeking recovery from

28

the party with primary liability.  Of course, where a creditor has already collected from a

guarantor or other party who may be secondarily liable, the debtor's liability to the creditor

is accordingly reduced.  The liability to the creditor, however, would ordinarily be replaced

by a corresponding liability to the guarantor.[8]  In any event, there is no evidence that the

Amendolas have paid any portion of the Moirs' claim against Ms. Wilson.  That being the

case, there is no legal basis for reducing the claim by the amount of the guarantee.

D.

Count IV, finally, does not seek relief independent of the other counts in the

complaint but simply asks that the Moirs' filed proof of claim be disallowed as a secured

claim and adjusted to take account of the court's ruling on the other counts.  As discussed,

the court finds no basis for disallowing any portion of the Moir claim.  However, because

the court has determined that the Moir deed of trust is subordinate to the TS3 and Toone

deeds of trust, and because the total amount of those liens and the County of Fairfax's claim

for unpaid real estate taxes exceed the apparent value of the property, the Moirs' claim is an

unsecured claim, since in bankruptcy a claim is secured only to the extent of the value of the

collateral securing the creditor's interest.  § 506(a), Bankruptcy Code.  Moreover, even as an

unsecured claim, the court has determined that payment of the $250,000 "investment return"

should be equitably subordinated to timely-filed unsecured claims.  Thus, as a practical

matter, no payment is likely to be made on the investment return.  However, to the extent

---

[8]  More precisely, a guarantor is subrogated to the creditor's claim to the extent of any
payments the guarantor has made.  § 509(a), Bankruptcy Code.  The guarantor is not entitled
to payment of the subrogated claim or of an independent claim for reimbursement or
contribution, however, until the creditor has been paid in full.  § 509(c), Bankruptcy Code.

29

assets should become available, the Moirs would be entitled to payment of the investment

return after the timely-filed unsecured claims have been paid in full.

    A separate judgment will be entered consistent with this opinion.


Date: _____         _____
                                     Stephen S. Mitchell
Alexandria, Virginia                 United States Bankruptcy Judge


Copies to:

Richard G. Hall, Esquire
4208 Evergreen Lane, Suite 234
Annandale, VA  22003
Counsel for the plaintiffs

Kenneth L Crosson, Esquire
Crosson & Sodowsky PLLC
12500 Fair Lakes Circle Suite 250
Fairfax, VA 22033-4904
Counsel for defendants David L. and Vanessa M. Moir

James R. Schroll, Esquire
Bean, Kinney & Korman, P.C.
2300 Wilson Boulevard, 7th Floor
Arlington, VA  22201
Counsel for defendants TS3 Grantor Trust and Charles Toone, Trustee

Geoffrey J. Greeves, Esquire
Greenberg Traurig
800 Connecticut Ave., NW
Suite 500
Washington, DC 20036
Counsel for defendants Brett A. Amendola and Roger Amendola

Jeffrey J. Fairfield, Esquire
459 Herndon Parkway, Suite 14
P. O. Box 546
Herndon, VA 20172-0546
Counsel for defendants Jeffrey J. Fairchild [*sic*] and Norman F. Hammer, Trustees